Richard A. GILBERT, Reorganization
Trustee of The Washington
Group, Inc.

**and**

Webster A. Collins et al., Plaintiffs,

**v.**

Smith W. BAGLEY et al., Defendants.

Civ. A. No. C–78–335–WS.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

June 2, 1980.

C. Edwin Allman, Jr., and R. Bradford Leggett, Winston-Salem, N. C., for Gilbert.

Thomas Winfield Blackwell, Jr., Jack F. Canady, Jack E. Thornton, Jr., Winston-Salem, N. C., Steptoe & Johnson, Washington, D. C., William S. Mitchell, Winston-Salem, N. C., for Collins, et al.

Russell M. Robinson, II, Charlotte, N. C., for Thomas.

G. Marlin Evans, Chas. E. Nichols, Edward L. Murrelle, Greensboro, N. C., for A. M. Pullen & Co.

Clarence W. Walker and Edgar Love, III, Charlotte, N. C., for Interstate Securities Corp.

Hubert Humphrey and James T. Williams, Jr., Greensboro, N. C., for Bagley.

E. Osborne Ayscue, Jr., Larry J. Dagenhart and W. Donald Carroll, Jr., Charlotte, N. C., T. V. Adams, North Wilkesboro, N. C., for Northwestern Bank.

Roy G. Hall, Jr., Winston-Salem, N. C., for Gilley.

Lloyd C. Caudle, John H. Northey, III, Charles E. Knox, Charlotte, N. C., for Johnston.

Joseph I. Moore, Jr., Chapel Hill, N. C., for Riggsbee.

Charles T. Hagan, Jr., Greensboro, N. C., Duane, Morris & Heckscher,. Philadelphia, Pa., for American Bank & Trust of Pennsylvania.

Bynum M. Hunter, Larry B. Sitton and William L. Young, Greensboro, N. C., Robert L. Burrus, Jr., McGuire, Woods & Battle, Richmond, Va., for Wheat First Securities, Inc.

Percy L. Wall, Greensboro, N. C., for Chapple.

MERHIGE, District Judge, Sitting by Designation.

## MEMORANDUM

The amended complaint in this action was filed on August 13, 1978. Several motions, including one for class certification, remain pending at this time.[1] A separate issue is whether the Reorganization Trustee may reimburse the other plaintiffs for their costs in this litigation, and this issue is currently before the United States Court of Appeals for the Fourth Circuit.[2] Defendants have moved to dismiss the amended complaint on various grounds, and this memorandum addresses those and related motions.[3] The parties have submitted extensive memoranda in support of and in opposition to said motions and they are thus ripe for disposition.

This suit is, in part, an action at law and in equity brought by the Reorganization Trustee of The Washington Group, Inc. ("the Company"). The Trustee seeks relief from certain former officers and directors of the Company, as well as other individuals and entities who allegedly joined in a course of unlawful activities. The Trustee alleges, in short, that defendants engaged in a course of conduct which violated their fiduciary duties and which constituted a waste and diversion of corporation income, assets and opportunities.

This suit encompasses as well allegations advanced by the Company's shareholders. Their claims are, in essence, that defendants engaged in a manipulative scheme designed to affect the market for the Company's stock and that defendants made material misrepresentations and omissions with regard to the Company, its stock and the terms of a prior judgment.

Plaintiff Richard A. Gilbert ("the Trustee") is the Company's duly appointed Trustee in Reorganization. The Trustee is a citizen and resident of the State of North Carolina, which is the domicile of the Company as well. The Company is presently engaged in reorganization proceedings in this court.[4]

1. The Court is of the view that it would be inappropriate to consider the motion for class certification at the present time. In its memorandum and order of September 5, 1979, see n.2, infra, the Court ruled that the Trustee may not expend funds from the debtor's estate to defray the litigation costs of the shareholder plaintiffs herein.

The principal issue presented in a motion for class certification is the ability of the named plaintiffs to adequately represent the interest of the entire class. Unquestionably the expenses of the shareholder plaintiffs in maintaining this action will be considerable. If the Trustee may not defray these costs, a question is raised regarding the ability and willingness of these named shareholder plaintiffs to defray these anticipated expenses to the end that the claims of the members of any class which may be certified are appropriately prosecuted.

The Court cannot, on the present record, make a determination of the ability or willingness of the named shareholder plaintiffs to shoulder the costs of their action. The Court is also of the opinion that the present memorandum should not be delayed so that the record may be supplemented with regard to the class action question. The ruling by the United States Court of Appeals for the Fourth Circuit may render such an inquiry unnecessary.

The Court's references to the various plaintiffs as "groups" or otherwise than as individuals should not be construed as intimating the ultimate ruling on the propriety of this action proceeding as a class action. Rather, the plaintiffs are treated here as they are described in the amended complaint.

2. This Court ruled that the Reorganization Trustee may not assume the litigation costs of the shareholder plaintiffs. In re The Washington Group, Inc., in Chapter X Reorganization Numbers B–77–695 through B–77–702 (September 5, 1979).

3. Defendant Dewey W. Chapple, Jr. has answered the amended complaint but has not filed a motion to dismiss same. The Court therefore cannot dismiss the allegations against this defendant even though the views stated in the memorandum would appear to be equally sound as to Chapple.

Plaintiffs' brief in opposition, at 42, indicates that they have abandoned all claims against defendant Wheat except as to Counts VIII and XII. Wheat will, therefore, be dismissed as to Counts I through VII and IX through XI.

The "related" motions include motions to strike, for a more definite statement and to sever the Trustee's claims.

4. In re The Washington Group, Inc., in Chapter X Reorganization Numbers B–77–695 through B–77–702.

The remaining plaintiffs are, or were, at all times relevant to this action, shareholders of the Company. For the sake of convenience, these plaintiffs are collectively identified as "the shareholder plaintiffs".

The shareholder plaintiffs are comprised of two constituent groups: The "tender offer plaintiffs" and the "purchaser plaintiffs". The "tender offer plaintiffs" are those who were shareholders on the record dates pertinent to the suit in *Shaffner.*[5] The "purchaser plaintiffs" are those stockholders who acquired shares in the Company by purchase during the period from November 4, 1972 through June 20, 1977.

The eleven defendants may be briefly identified as follows: [6]

Smith W. Bagley ("Bagley") was one of the Company's controlling shareholders, member of the Board of Directors, and President of the Company from April 25, 1972 until December, 1972.

James R. Gilley ("Gilley") was also a controlling shareholder of the Company. Gilley was a member of the Company's Board of Directors and one of its officers beginning in April, 1972. Gilley's active participation in the Company's management ended in January, 1978.

David R. Johnston ("Johnston") was the principal stockholder of the Johnston Mills Company. Johnston Mills was acquired by the Company on April 18, 1973. Johnston allegedly received a substantial employment contract as part of the purchase price for his shares.

Michael W. Riggsbee ("Riggsbee") was an officer or employee of the Company or one of its affiliates at all times relevant to this action.

The Northwestern Bank ("Northwestern") is a North Carolina banking corporation. Northwestern served as trustee of the Company's employee pension plan beginning in September, 1974. Northwestern was also the trustee of the Company's profit sharing plans from September, 1975 until their termination in 1976. Bagley, at one time an employee of Northwestern, was a director of Northwestern Financial Corporation, Northwestern's parent company, during the period relevant to this action. During all times material to the lawsuit, Gilley was a member of Northwestern's Board of Directors.

Dewey W. Chapple ("Chapple") was an Executive Vice President of Northwestern and the officer in charge of the bank's operations in Winston-Salem, North Carolina. Bagley had supervisory authority over Chapple during the former's employment with Northwestern.

American Bank and Trust Company of Pennsylvania ("American") is a Pennsylvania banking corporation. American was trustee of the Company's employee profit-sharing plans from September 30, 1974 until September 30, 1975. American also served as custodian of the Company's employee stock-purchase plan from August 29, 1974 until the plan's termination on October 30, 1976.

Wheat First Securities, Inc. ("Wheat") is an investment banking firm and a member of The New York Stock Exchange.

Interstate Securities Corporation ("Interstate") is also an investment banking firm and a member of The New York Stock Exchange.

William F. Thomas ("Thomas") was a Vice President and Account Executive of Interstate at all times relevant to this action.

A. M. Pullen and Company ("Pullen") is a partnership engaged in the public accounting profession. Pullen, at various times relevant to this controversy, audited the financial records and certified the financial statements of the Company.

---

**5.** *Shaffner, et al. v. The Washington Group, Inc., et al.*, Civil Action No. C–37–WS–73 (M.D. N.C.1973). *Shaffner's* relevance to the instant action will become readily apparent, *infra*.

**6.** The relationship of the defendants to the Company is taken from the amended complaint for two reasons. First, most of the defendants had not·yet answered the complaint when the motions were filed. Second, plaintiff is entitled to all reasonable inferences during the determination of a motion to dismiss.

The claims of the shareholder plaintiffs are set forth in Counts ·I through VIII of the amended complaint. Those allegations arise from two occurrences: a 1973 merger, and the settlement of a suit filed in this court. A summary of the plaintiffs' allegations is necessary to fully appreciate the scope of the wrongs charged to these defendants.

Bagley and Gilley were Chairman of the Board of Directors and President, respectively, of Convenient Systems, Inc. ("CSI") prior to April 14, 1972. Together they owned a majority of CSI's outstanding shares. On April 14, 1972 CSI borrowed 2.5 million dollars from United Virginia Bank ("UVB") of Richmond, Virginia. Bagley and Gilley were guarantors on this note for the full amount of the indebtedness.

The purpose of the UVB loan was to provide CSI with the capital necessary to purchase approximately 31% of the Company's shares. CSI purchased those shares in 1972 and thereby gained working control of the Company.

On January 18, 1973 CSI was merged with a wholly-owned subsidiary of the Company, Washington Mills Retail, Inc. As a result of this merger, Bagley became the owner of 32.5% of the Company's stock. Gilley's CSI stock was transformed into ownership of 33.1% of the Company's shares. Following the merger, the UVB loan was assumed by the survivor of the CSI—Washington Mills merger, Convenient Systems, Inc.

The Washington Mills—CSI merger precipitated the *Shaffner* litigation. The *Shaffner* plaintiffs contended that the merger violated federal, state and common law. An "Agreement of Settlement" was executed by the parties to that litigation on July 12, 1973. This Court thereafter entered a dismissal in the case, specifically incorporating the terms of the agreement into the judgment. The first paragraph of the settlement agreement is particularly relevant to this action. That paragraph required the Company to offer to purchase the shares held by qualified shareholders of the Company.[7]

The shareholder plaintiffs contend that defendants engaged in a course of conduct designed to maintain the market price of the Company's stock at artificially high prices. Bagley and Gilley are alleged to have either persuaded or coerced relatives, business associates and employees into purchasing shares of the Company when demand therefor was low. Northwestern, through Chapple's direction, purportedly assisted in those purchases by extending loans under circumstances not in the regular course of business.

Northwestern and American are also alleged to have exercised their control over the Company's deferred compensation plans as a vehicle to further create artificial demand.

Interstate and Thomas allegedly aided Bagley and Gilley's efforts by discouraging sales and inducing purchases of the Company's shares. This investment advice was allegedly offered with knowledge of the purported scheme to maintain the market price for the Company's shares.

The amended complaint charges Pullen with violation of its duty as an independent auditor and deviation from generally accepted accounting principles. These violations are said to have occurred in the preparation of the Company's annual reports, in-

---

7. Paragraph one of the *Shaffner* settlement agreement provided:

The Corporation shall offer to purchase from each shareholder presently owning shares of The Washington Group, Inc. (formerly The Washington Mills Company) who was a shareholder on May 19, 1972 (the record date for the June 22, 1972 special shareholders meeting), or on November 13, 1972 (the record date for the December 21, 1972 special shareholders meeting) at a price of $19.00 per share for all the shares of the Corporation which were held by each shareholder on either of said dates, including the shares issued thereafter as a result of the subsequent stock split, and which are still held by such shareholder on the date of the shareholder's acceptance of the offer; provided, however, that this offer shall not be made to any of the defendants. This offer will remain open for a period of 30 days after notice thereof is sent to the shareholders.

come statements and a federally-required disclosure form.

The allegations against Wheat arise from its involvement in the 1973 merger. It is argued that Wheat overvalued the stock of CSI and undervalued the stock of Washington Mills. The allegedly inaccurate exchange ratio would have substantially improved the terms of the merger as to Bagley and Gilley.

Upon this summary of the shareholder plaintiffs' allegations, the Court turns to the arguments aimed at each of their claims.

## COUNT I

Count I alleges that defendants, by their conduct heretofore described, violated § 10(b) of The Securities Exchange Act of 1934 [8] and Rule 10(b)–5 of The Securities Exchange Commission.[9] The "tender offer plaintiffs" contend that defendants' market manipulation scheme discouraged them from accepting the *Shaffner* offer. The "purchaser plaintiffs" were allegedly induced into purchasing shares by reason of defendants' efforts to stabilize the market price.

■ The defendants have moved to dismiss the claim of the "tender offer plaintiffs" in accordance with the decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539

(1975). For the reasons which follow, the Court is of the view that defendants' position in this regard is well taken.

The purchaser-seller requirement for standing to maintain a § 10(b) action was first enunciated in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The *Birnbaum* rule received the approval of the Supreme Court in *Blue Chip, supra,* 421 U.S. at 731, 95 S.Ct. at 1923.

*Blue Chip, supra* arose in a factual setting not unlike that of the instant suit. There, an antitrust action instituted against petitioner's predecessor by the United States culminated in the entry of a consent decree. The decree called for the reorganization of the predecessor requiring, *inter alia,* that a majority of petitioner's shares be offered to those retail businesses formerly subscribing to the predecessor's service. Approximately one-half of the shares offered were in fact purchased.

The *Blue Chip* litigation was instituted two years after the offering. The complaint alleged that petitioner's overly pessimistic forecast of its future prospects violated § 10(b) and Rule 10(b)–5 and prevented their acceptance of the offering. The sole issue presented to the Court was whether petitioners had standing to pursue

8. 15 U.S.C. § 78j(b) (1970); which provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. .
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors.

9. 17 C.F.R. § 240.10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
. . . in connection with the purchase or sale of any security.

a remedy where they allege that the offeror had violated the provisions of Rule 10b–5 of the Securities and Exchange Commission, under circumstances where they had neither purchased nor sold any of the offered shares. *See Blue Chip, supra* at 725, 95 S.Ct. at 1920.

The *Blue Chip* decision rested upon an analysis of the legislative history of the Act, prior attempts to expand its coverage and the implications as to various policy considerations. Each of those factors compels the conclusion in the instant action.

Section 10(b), on its face, applies only to fraud, etc. in connection with a purchase or sale of a security. The Act provides, at 15 U.S.C. § 78c(a)(14) that "the terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." "Buy" and "purchase" are given a corresponding definition at 15 U.S.C. § 78c(a)(13). In its consideration of the Act, the Senate rejected a definition for each of those terms which would have been significantly broader.[10] The clear inference is that Congress did not seek to include an offer to purchase or sell within the prohibition of § 10(b).

It is also significant that Congress, in 1959 and 1957, declined to expand § 10(b)'s coverage upon the solicitation of the Securities and Exchange Commission. The SEC's recommendation would have added the following emphasized portion to § 10(b):

(b) To use or employ, in connection with the purchase or sale of, *or any attempt to purchase or sell*, any security . . . .

Congress did not adopt this proposed amendment primarily because of its apprehension with regard to extending § 10(b) liability to that extent. *See Blue Chip, supra* at 732, 95 S.Ct. at 1923.

The policy considerations supporting the purchaser-seller requirement are well known and need be stated only briefly. The *Blue Chip* formula appropriately inhibits nuisance or "strike" suits that can be vexatious and which may assume a settlement value far in excess of their merit. Additionally, the purchaser-seller requirement conditions the prosecution of such an action upon a demonstrable event rather than a plaintiff's recollection of his subjective reasons for not purchasing or selling.

The "tender offer plaintiffs" do not, nor indeed could they, contest the reasoning or applicability of *Blue Chip, supra*. Rather, they contend that they were purchasers within the contemplation of the Act by virtue of the *Shaffner* settlement.

Plaintiff's argument that a contract for sale satisfies the *Blue Chip* rule finds support in the Act's definition and the concurrence of Mr. Justice Powell, even though the majority in *Blue Chip* did not reach the issue. The Court's difficulty in adopting plaintiff's argument as to this aspect lies in the interpretation of the *Shaffner* settlement agreement.

Upon a review of the settlement agreement, the Court is forced to conclude that the "tender offer plaintiffs' " rights therein entitled them only to an offer from the Company. As is evident from the preceding discussion of *Blue Chip*, such is not sufficient to confer § 10(b) standing upon these plaintiffs.

The Court's conclusion also rests additionally upon its understanding of why a contract for sale might confer standing upon a plaintiff. A contract for sale, like an actual sale, would delimit the buyer and seller, the number of shares involved, and the price. Just as important, the contract would evidence a firm commitment of the parties to make the exchange.

In the instant case the buyer, seller and sales price are established by the *Shaffner* agreement. But while the corporation was

---

10. The definitions rejected by the Senate were:

The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire, contract of purchase, attempt or offer to acquire or solicitation of an offer to sell a security or any interest in a security.

The terms "sale" and "sell" each include any contract of sale or disposition of, contract to sell or dispose of, attempt or offer to dispose of, or solicitation of an offer to buy a security or any interest therein.
*See Blue Chip, supra* at 750, n.13, 95 S.Ct. at 1932 n.13.

required to offer to purchase all of the "tender offer plaintiffs' " shares, there was no commitment on the part of the "tender offer plaintiffs." The quantity of shares to be traded was thus not fixed and this action would be dependent upon a multitude of subjective factors on the part of the "tender offer plaintiffs." *See e. g. Blue Chip* at 758, n. 2, 95 S.Ct. at 1926, n. 2, Powell, *J.*, concurring. The fact that the range of speculation is limited in this case is no ground for circumventing the purchase-sale requirement.

The amended complaint defines the purported class of "purchaser plaintiffs" as those "who purchased shares of the Company during the period from November 4, 1972 through June 20, 1977." The "purchaser plaintiffs" have thus, at least by their allegation, satisfied the rule of *Blue Chip*. The defendants, however, raise several arguments with regard to the claims of the purchaser plaintiffs under Count I.

Bagley contends that the "purchaser plaintiffs' " claims should be dismissed by virtue of the amended complaint's failure to differentiate between the purported classes of plaintiffs and the dismissal of the "tender offer plaintiffs' " claims.

Bagley cites no authority holding that the ultimate penalty of dismissal is warranted. The Court declines to take such drastic action; especially in light of its duty to construe pleadings in a manner to provide substantial justice. Further, the amended complaint does state that each of the purchaser plaintiffs was

> entitled to make his or her decision as to whether to purchase such shares free from illegal manipulation and misrepresentation and material omissions. *Amended Complaint*, ¶ 9.

That paragraph was incorporated by Count I and Bagley was thus apprised of the nature of the "purchaser plaintiffs" claims.[11]

■ Several defendants[12] further seek dismissal of Count I[13] for failure to satisfy the pleading requirements of Fed.R.Civ.P. 9(b). That rule provides that

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Defendants have cited a host of cases which held plaintiffs in similar actions to a high degree of particularity. *See e. g. Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) and *Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972). The Court is satisfied, however, that the amended complaint has fulfilled the objectives of Rule 9(b) and met the requirements of the Federal Rules of Civil Procedure.

■ Rule 9(b)'s particularity requirement promotes two important objectives. First, it affords the defendant fair notice of the nature of plaintiffs' claim and the grounds upon which it is based. *Denny, supra* at 469. Second, Rule 9(b) helps to insure that a complaint is based upon a reasonable belief that a wrong has been committed. *Segal, supra* at 607–08. This is particularly important where allegations are leveled against professionals whose livelihood depends, in large measure, upon their reputation. *See Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 245 (S.D.N.Y.1975).

Rule 9(b) does not contradict the theory of notice pleading embraced by the Federal Rules in general, and Rule 8, in particular. The relationship between Rules 8 and 9 is complementary:

> It is inappropriate to focus exclusively on the fact that Rule 9(b) requires particu-

---

**11.** Contrary to Bagley's assertion, the purchaser plaintiffs have not complained that defendants' actions or conduct induced them not to sell. Plaintiff undoubtedly recognizes that an allegation of such injury would clearly be barred by *Blue Chip* where these plaintiffs could not even assert standing by virtue of the *Shaffner* agreement.

**12.** Defendants Bagley, Gilley, Johnston, Riggsbee, Northwestern, American, Wheat and Pullen have attacked the complaint under Fed.R. Civ.P. 9(b).

**13.** These challenges are also raised, in large measure, with respect to the other counts sounding in fraud.

larity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.

5 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1298 (1969).

■ So long as the complaint affords defendant notice of the claims against him and evidences a reasonable belief on plaintiffs' part that his complaint has merit, Rule 9(b) is satisfied and the philosophy of Rule 8 is unencumbered. This is an accord with Judge Bryan's opinion in *Poller v. First Virginia Mortgage and Real Estate Investment Trust*, [1978 Transfer Binder] CCH Fed.Sec.L.Rptr. ¶ 96,564 (E.D.Va.1978) from which plaintiffs have quoted extensively.

■ In examining the complaint to determine whether it affords defendants the notice to which they are entitled, the Court is guided by *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48 (M.D.N.C.1976). There a defendant challenged, under Rule 9(b), the allegations that it "artificially inflated statements" in "various interrelated financial reports" and made "material misstatements of fact." The allegations were held sufficient under Rule 9(b) because the wrongful activities in which defendant was alleged to have participated were identified, the nature of the alleged misrepresentations was stated and because pertinent documents were identified at least by category. The Court agrees that this is all that Rule 9(b) requires. Defendants are not entitled, at least at this stage, to know every piece of evidence which will be offered against them. *See e. g. DuPont v. Wyly*, 61 F.R.D. 615, 630–32 (D.Del.1973). The liberal provisions in the Federal Rules for discovery and other pretrial procedures are particularly well-suited for narrowing the issues in dispute and their availability counsels against dismissal.

An examination of the allegations of the amended complaint as against some of the defendants raising a Rule 9(b) challenge is appropriate in support of the Court's conclusion that fair notice has been given.[14]

The amended complaint alleges that Bagley and Gilley, with the aid and agreement of other defendants, employed a scheme to maintain the market price for the Company's shares at an artificially high level. The scheme is said to have begun in January, 1973 and continued until some time in June, 1977. The amended complaint sets forth Bagley's and Gilley's alleged motives for engaging in the conduct complained of.

The amended complaint refers to the numerous elements of the alleged scheme. Thus, it points to stock-purchase loans arranged by Bagley and Gilley and alleges that they induced or coerced stock purchases by employees, business associates and relatives. Bagley and Gilley purportedly entered into repurchase agreements with Riggsbee and Johnston. These defendants also allegedly acted in concert with Interstate and Thomas to *inter alia* induce purchases and deter sales. Bagley and Gilley further are alleged to have used the Company's employee deferred compensation plans to create artificial demand for the Company's stock. Finally, these defendants allegedly acted in concert with Pullen in preparing false or misleading financial documents.

Paragraph seventy-four of the amended complaint avers that Johnston participated in the alleged scheme as an "escape valve". Johnston purportedly purchased shares in the Company from those whom Bagley and Gilley had, allegedly, previously induced or coerced into making purchases. Johnston's involvement allegedly enabled his transferors to meet the commitments of their stock purchase loans. Bagley and Gilley allegedly guaranteed to repurchase those shares from Johnston at a price equal to his cost plus $2.00. The approximate dates of Johnston's purchases are found in the amended complaint at paragraph seventy-one.

---

14. The Court does not interpret any of the defendants' memoranda as suggesting that the purchaser plaintiffs lacked a reasonable belief that their claim was meritorious, and thus that the purpose of Rule 9(b) has been satisfied. The remaining inquiry, then, is whether defendants have been afforded fair notice of the plaintiffs' claims.

To be sure, the amended complaint could have been more specific; if plaintiffs possessed the necessary information. The preceding discussion with regard to specific defendants is illustrative of the amended complaint's allegations as to the other defendants. The Court thus deems it unnecessary to address this point in further detail.

Six defendants have moved to dismiss Count I contending that its allegations are insufficient apart from the purchaser-seller requirement of *Blue Chip, supra,* and Rule 9(b). In light of the nature of the inquiry at this stage, those motions must be denied.

█ The plaintiff is entitled to the benefit of every favorable inference when the complaint is attacked under Fed.R.Civ.P. 12(b)(6) as failing to state a claim under which relief can be granted. In *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) this well-recognized rule was stated thusly:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. 355 U.S. at 45–46, 78 S.Ct. at 102.

The Court's inquiry, then, is limited to considering whether the elements of unlawful conduct are stated sufficiently to give the defendant fair notice.

█ Plaintiff in an action under Rule 10(b)–5 must plead and prove four elements: (1) conduct by the defendant which is prohibited by the Rule; (2) plaintiff's purchase or sale of a security "in connection with" that conduct; (3) damages, *see Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir. 1974); and (4) scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

█ Bagley and Gilley are alleged to have engaged in a manipulative scheme which included stock-loan transactions, employee deferred benefit plan purchases, artificial market-making and false and misleading financial reporting. Each of these activities are alleged to have been effected with the intent to artificially maintain or drive-up the price of the Company's shares. The purchaser plaintiffs allegedly acquired their shares, at least in part, upon the success of the scheme. Resultant damages are pleaded. The Court is thus satisfied that a Rule 10(b)–5 claim has been stated.

The gist of plaintiffs' allegations as to the remaining defendants appears to be that they assisted Bagley and Gilley in the alleged scheme to maintain the market price of the Company's shares. The sufficiency of Count I as to these defendants must thus be considered in terms of secondary liability under Rule 10(b)–5.

█ To allege a conspiracy to violate the securities laws a plaintiff must plead two elements. There must first be an allegation of an agreement to accomplish a wrongful purpose. *S.E.C. v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Such an agreement can, of course, be either express or inferred from defendant's conduct. *See e. g. Brennan v. Midwestern United Life Insurance Co.,* 417 F.2d 147, 149 (7th Cir. 1969), *cert. denied* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). Second, plaintiff must allege acts by the defendant in furtherance of the conspiracy. *Herpich v. Wilder,* 430 F.2d 818, 819 (5th Cir. 1970), *cert. denied* 401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971); *Ross v. Licht,* 263 F.Supp. 395, 411 (S.D.N.Y.1967).

█ Aiding and abetting liability under the securities laws is dependent upon allegations and proof of three elements. First, some other party must necessarily have committed a securities violation. Second, plaintiff must allege that the defendant had a general awareness that his role was part of an overall improper activity. Finally, plaintiff should allege that defendant knowingly and substantially assisted in the securities violation. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 96 (5th Cir. 1975); *S.E.C. v. Coffey, supra, cf. Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38,

47–48 (2d Cir.), *cert. denied* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

 Defendant Johnston allegedly agreed with Bagley and Gilley that he would purchase company stock from the latters' employees, relatives and associates in order to satisfy the stock-loan commitments. The dates of Johnston's purchases are alleged. The terms of the alleged agreement and its circumstances, if proven, establish Johnston's general awareness of his role in Bagley and Gilley's alleged securities violations. The amended complaint alleges that Johnston's purchases were necessary to further the market manipulative scheme. Johnston's state of mind is averred generally as per Rule 9(b). The amended complaint thus states a claim of conspiratorial and aiding and abetting liability against Johnston.

Defendant Riggsbee is also alleged to have acted in concert with Bagley and Gilley by making strategic purchases of Company stock. The amended complaint, in ¶¶ 76, 103 and 104 alleges that said purchases were made pursuant to an agreement with Bagley and Gilley, and with Riggsbee's knowledge of the scheme to artificially maintain or raise the market price for the Company's shares. Riggsbee's alleged assistance must be viewed as substantial as it was, in part, a direct and proximate cause of plaintiff's damages.

Northwestern allegedly agreed with Bagley and Gilley to arrange for stock-purchase loans to permit sales to effect the wrong. The loans and purchases were allegedly in furtherance of Bagley and Gilley's scheme. Northwestern is alleged to have known the purpose of the loans and its role, and paragraph 81 of the amended complaint avers that this substantially assisted the manipulative scheme.

Northwestern is further alleged to have acted in concert with Bagley and Gilley in purchasing or holding Company stock in the employee deferred benefit plans as part of the scheme. Paragraph 82 of the amended complaint alleges that Northwestern's activities were "in order to artificially inflate the market," thus alleging this defendant's general awareness of the impropriety and its substantial assistance.[15]

Paragraph 94 of the amended complaint alleges that American agreed with Bagley and Gilley to use the employee benefit plans to create artificial demand for the Company's stock. American allegedly purchased shares of the Company for that purpose. It is thus axiomatic that American is alleged to have had a general awareness of Bagley and Gilley's improper activity. A cause of action is thus stated.

Pullen is alleged to have participated in the conspiracy by certifying false and misleading financial records. It is alleged that such documents furthered Bagley and Gilley's scheme and that Pullen knew the statements to be false. The amended complaint is thus sufficient to withstand a § 12(b)(6) motion.

The foregoing summary of the allegations as to particular defendants is sufficient to state the Court's view as to the sufficiency of the pleading as to all defendants. Accordingly, the motion to dismiss will be denied as to the "purchaser plaintiffs'" claims under Count I, and granted as to those of the "tender offer plaintiffs."

## COUNT II

Count II of the amended complaint alleges a violation of § 14(e) of The Williams Act, 15 U.S.C. § 78n(e)[16], and Rule 10b–13,

---

**15.** In support of its motion to dismiss under 12(b)(6) Northwestern places principal reliance upon *Woodward, supra* and *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3rd Cir. 1973). Northwestern's reliance is misplaced and, at this stage, premature. *Woodward* addressed a dismissal by the district court after it had entertained plaintiff's evidence. *Landy* involved a review of an award of summary judgment where, necessarily, no genuine issue of

material fact was in dispute. Both cases thus address the *proof* which is a prerequisite for recovery which is inapposite to addressing the sufficiency of the *complaint* itself.

**16.** 15 U.S.C. § 78n(e) provides, in pertinent part:

It shall be unlawful for any person to make any *untrue statement of a material fact* or omit to state any material fact necessary in

17 C.F.R. § 240.10b–13,[17] which was adopted by the Commission pursuant to § 14(e). At the core of the amended complaint is the shareholder plaintiffs' assertion that the *Shaffner* settlement agreement entitled them to receive a tender offer from the Company.

■ Defendants have advanced several arguments in favor of dismissal of Count II. It is first argued that neither *Shaffner* nor the offer initiated by the settlement constituted a tender offer within the contemplation of § 14(e). Defendants also assert that the "purchaser plaintiffs" lack standing to bring this claim as they were not recipients of the *Shaffner* offer. Finally, the shareholder plaintiffs' standing under Rule 10b–13 is challenged upon their failure to tender the shares in question. The Court, for the reasons which follow, is of the opinion that *Shaffner* neither was, nor contemplated, a tender offer. Count II should thus be dismissed and the Court, accordingly, need not address defendants' alternative arguments.

Count II, by requiring the Court to search for a meaning of the term tender offer, presents an issue which has caused the federal courts much difficulty. The term is not defined in either the Williams Act or the regulations promulgated thereunder. Tender offers are generally thought to have several characteristics upon which a working definition may be based. A tender offer may thus be understood as a publicly made invitation addressed to all shareholders of a corporation to tender their shares for a consideration of cash or other securities. The consideration usually represents a premium above the current market price. The offer typically remains open for a limited time; often for only two weeks. The offeror's performance is usually conditioned upon the tender of a minimum number of shares. During the tender period, tendered shares are held in an escrow or depository. Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 Harv.L.Rev. 1250, 1251–52 (1973) (hereafter *"Tender Offer"*).[18]

By contrast, the *Shaffner* settlement directed that the Company offer to purchase the shares of a limited group of shareholders. The cash consideration for the exchange, $19.00 per share, did not represent a premium price in light of the contemporary market price of the Company's shares. *See* amended complaint, ¶ 104. Further, the actual and most valuable consideration was stated in the preamble to the settlement agreement:

> In order to settle the actions and claims of the individuals, classes and the corpo-

order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation.

17. C.F.R. § 240.10b–13 provides

No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to

such tender offer or exchange offer may by the terms of such offer be accepted or rejected: *Provided, however,* that if such person is the owner of another security which is immediately convertible into or exchangeable for the security which is the subject of the offer, his subsequent exercise of his right of conversion or exchange with respect to such other security shall not be prohibited by this rule.

18. *Accord,* E. Aranow and H. Einhorn, *Tender Offers for Corporate Control* (1973) where "tender offer" is defined as

A public offer or solicitation by a company, an individual or a group of persons to purchase during a fixed period of time all or a portion of a class or classes of securities of a publicly held corporation as a specified price or upon specified terms for cash and/or securities.

*Aranow, supra* at 70.

ration on a uniform basis, to put to rest all controversy and to avoid the inconvenience, expense and distraction of further litigation . . . .

The *Shaffner* offer was to remain open for acceptance for a thirty day period after notice had been given to the class members. The Company's performance was not conditioned upon the tender of a minimum number of shares, but was instead subject only to the approval of the Court and the shareholders. Tendered shares were thus immediately sold as opposed to being held in escrow. Finally, the requisite notice was more than mere publication as is typical in tender offers. In short, *Shaffner* was a settlement agreement and nothing more; it was not a tender offer subject to the Williams Act as that term is commonly understood.

There is an additional, and perhaps more compelling, reason why the *Shaffner* settlement should not be deemed to be a tender offer. That conclusion rests not upon the formal elements and characteristics of the offer but upon the legislative history of the Williams Act, the general doctrine under which it should be construed and policy considerations regarding the appropriate scope of the Williams Act.

*"Tender Offer", supra,* suggests four possible definitions for that term. "Tender offer" could be limited to those transactions described above and which may be labeled conventional tender offers. *Yellow Freight System, Inc.,* [1972–1973 Transfer Binder], CCH Fed.Sec.L.Rptr. ¶ 79,912 (SEC Staff Letter, Nov. 14, 1972) and *Cattlemen's Investment Co. v. Fears,* 343 F.Supp. 1248 (W.D.Okl.1972), *vacated per stipulation* (W.D.Okl.1972) demonstrate, however, that the term tender offer has been given a broader meaning.

The term could also be used to embrace any offer to purchase or exchange securities. Apart from unduly extending the reach of the securities laws, it is apparent that Congress did not intend such a meaning. If it had, the Williams Act would refer to "offers", not "tender offers". This recommended definition would require disclosure under 15 U.S.C. § 78n(d) upon every purchase and thus obviate the disclosure provisions of § 13(d) of the Act.

Or, the term could be limited to offers involving takeover bids. This would be consistent with the principal concern of Congress. Such a definition would, however, require an examination of the offeror's subjective intent to determine whether an offer was made in the context of a takeover attempt. The 5% standard used under § 14(d) would not provide a workable objective standard because Congress clearly distinguished between holdings of 5% and tender and *nontender* offers.

Finally, *"Tender Offer", supra,* suggests the term could be understood as covering those species of acquisitions falling within the conventional meaning *or* which have the same impact upon the shareholder offerees as the conventional. A tender offer would thus be any method of acquisition with the capability of exerting pressure upon shareholders to make uninformed, ill-considered decisions. This would leave the disclosure requirements of § 13(d) and § 14(d) with distinct spheres of importance.

The last suggestion is consistent with the legislative history of the Williams Act. As previously intimated, the breadth of the tender offer requirements is considerably broader than that suggested in the legislative history. The perception of the Congressional purpose in adopting the Williams Act remains unchanged, however. As stated by the Williams Act's chief sponsor:

This legislation will close a significant gap in investor protection under the Federal securities laws *by requiring the disclosure of pertinent information to stockholders* when persons seek to obtain control of a corporation by a cash tender offer.

113 Cong.Rec. 854 (1967) (emphasis added). Insuring that offeree shareholders receive the necessary information upon which to make informed decisions was thus the prin-

cipal reason behind the adoption of the Williams Act.[19]

*Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) counseled that the existence of an implied remedy under the Williams Act should be determined upon a consideration of that Act's purpose. In *Piper* the court held that an aggrieved tender offeror had no remedy under the Williams Act because the law was intended to afford protection only to shareholders.

The Court is of the opinion that a corollary to the doctrine or approach relied upon in *Piper, supra* is applicable here. Not only the existence of a remedy, but the scope of its coverage, as well, should be determined in accordance with the Williams Act's purpose. Upon this reasoning, a tender offer would be limited to those acquisitions wherein shareholder offerees require information in order to make well-considered investment decisions. The fourth definitional suggestion found in *"Tender Offer", supra,* thus finds support in the analytical approach of *Piper, supra.*

This line of reasoning was also relied upon, inferentially, in *Brucker v. Thyssen-Bornemisza Europe, N. V.,* 424 F.Supp. 679 (S.D.N.Y.1976), *aff'd sub nom. Shamrock Corp. v. Indian Head, Inc.,* 559 F.2d 1202 (2d Cir. 1977). In *Brucker* three class actions had been instituted on account of a tender offer. The parties entered into a stipulated settlement agreement. The reported opinion addressed the various objections to the settlement, including allegations of the Williams Act violations.

The Williams Act claims were dismissed with little discussion. The Court stated, in pertinent part:

> They [the objectors] claim that the notice constitutes a "tender offer", and as such the defendants have failed to comply with the filing requirements of the Act. *While the settlement agreement does contemplate what might technically be described as a tender offer, we think that these sections were not meant to apply to judicially approved settlement agreements,* particularly in light of the legislative history. *Brucker, supra* at 691. (Emphasis added).

The Court premised the aforementioned conclusion on the Williams Act's purpose of affording protection and information for shareholders and the notice which was provided by the settlement. *Id.* at 692.

The Court is satisfied that the *Brucker* decision, resting as it does upon the Williams Act's purpose and legislative history and securities policy, is determinative of the instant issue. *Shaffner* provided the requisite information to affected shareholders[20] and the continuing supervision of the court afforded an extra measure of shareholder protection. The Court is of the opinion that the Williams Act did not intend that acquisitions of this variety fall within the label "tender offer". Count II will thus be dismissed.

## COUNT III

Count III alleges that defendants violated § 15(c)(1) of the 1934 Act, 15 U.S.C. § 78*o*(c)(1),[21] and Rule 15c1–2,[22] 17 C.F.R.

---

**19.** Section 14(e) does not, of course, contain the disclosure requirements found in § 14(d). Both sections do, however, aim for dissemination of pertinent information. Further, plaintiffs have not suggested that "tender offer" has a different meaning in § 14(e) than in § 14(d).

**20.** The record in *Shaffner* discloses that each member of the class was noticed on July 12, 1973 to appear to raise any objection to the Agreement of Settlement. Shareholders were further advised that the settlement would be an agenda item at the April 30, 1974 stockholders meeting. The offer to purchase the company's shares was formally extended on May 3, 1974. The offer was to remain open until June 3, 1974. The *Shaffner* class was thus given notice

of the settlement and its terms on several occasions and the class members could have considered the value of the offer for approximately eleven months.

**21.** 15 U.S.C. § 78*o*(c)(1) provides that

> No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or

§ 240.15c1–2, promulgated thereunder. The allegations of this count are based upon the alleged "market-making" activities of defendants Thomas and Interstate.[23] The remaining defendants, assumedly, are charged with conspiring to violate the aforementioned prohibitions or in aiding and abetting a violation.

Defendants have generally advanced two arguments [24] in support of their motion to dismiss this count. The first contention addresses the scope of § 15(c)(1). The second argument is more specifically aimed at the standing of the "tender offer plaintiffs" to assert a claim under § 15(c)(1). The Court is of the opinion that these arguments are well taken and that Count III, in large part, must be dismissed.

Section 15(c)(1) by its terms, prohibits the use "of any manipulative, deceptive, or other fraudulent device or contrivance" by a broker or dealer. This should be contrasted with other sections of the Act, e. g., § 10(b) and § 14(e), which extend liability to "any person." The shareholder plaintiffs would have this Court extend liability, under aiding and abetting or conspiracy theories, to those not otherwise within the scope of the section.

An identical claim was rejected by the court in *In re Equity Funding Corporation of America Securities Litigation,* 416 F.Supp. 161 (C.D.Cal.1976). The *Equity Funding* plaintiffs attempted to advance

claims under §§ 11 and 12 of the 1933 Act, under an aider and abettor theory, against those who would not have otherwise been liable under those sections.[25] In resolving the issue, the court stated:

> This court is of the opinion that where a statute specifically limits those who may be held liable for the conduct described by the statute, the courts cannot extend liability, under a theory of aiding and abetting, to those who do not fall within the categories of potential defendants described by the statute. To impose such liability would circumvent the express intent of Congress in enacting these statutes that proscribe narrowly defined conduct and allow relief from precisely defined parties.

*Equity Funding, supra* at 181. The Court is of the view that this reasoning is equally applicable to those sections of limited breadth under the 1934 Act and to a conspiracy theory as well as aiding and abetting.

Further, the shareholder plaintiffs have cited to the Court no cases reaching a contrary conclusion. Plaintiffs did urge upon the Court *United States v. Projansky,* 465 F.2d 123 (2d Cir.), *cert. denied* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972) and *United States v. Stein,* 456 F.2d 844 (2d Cir.), *cert. denied* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333, *reh. denied* 409 U.S. 898, 93 S.Ct. 101, 34 L.Ed.2d 157 (1972).

---

other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent.

**22.** The Commission promulgated Rule 15c1–2 pursuant to the mandate of the last sentence of § 15(c)(1). The Rule provides

(a) The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in Section 15(c)(1) of the Act, is hereby defined to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

(b) The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in Section 15(c)(1) of the Act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circum-

stances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.

**23.** The amended complaint does not identify Thomas and Interstate as the alleged principal wrongdoers. The shareholder plaintiffs' theory in this regard was stated, however, in their brief in opposition at 10.

**24.** The Court need not address the arguments of defendant Wheat. *See* n.3, *supra*.

**25.** Section 11 of the 1933 Act is directed toward a limited category of actors, e. g. signators to a registration statement and directors and partners of the issuer. Likewise, § 12 of the 1933 Act is directed only to the seller of the security purchased by the plaintiff.

Those cases were decided under § 9(a) of the 1934 Act, 15 U.S.C. § 78i(a), which is § 15's counterpart for exchange-traded securities. The shareholder plaintiffs would rely upon *Projansky* and *Stein* as authority for holding non-brokers and non-dealers amenable under § 15(c)(1). The Court must reject such an analogy, however, because, unlike § 15, § 9(a) prohibits conduct by "any person".

■ Under the *Equity Funding* rationale, which the Court adopts, Count III must be dismissed as to all defendants except Thomas and Interstate. Addressing the purchaser-seller requirement of § 15(c)(1) with regard to Thomas and Interstate, the Court concludes as follows:

Section 15(c)(1) proscribes certain conduct "to effect any transaction in, or to induce the purchase or sale of, any security." The similarity of this wording with that of § 10b is readily apparent and thus it is not surprising that the *Birnbaum* rule has been applied to bar claims asserted under § 15(c)(1).

In *Iroquois Industries, Inc. v. Syracuse China Corporation,* 417 F.2d 963 (2d Cir. 1969), *cert. denied* 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), the plaintiff therein extended a tender offer to the defendant's shareholders. Upon failure of the tender offer the plaintiff sued, alleging that fraud by defendant's officers, directors, and stockbrokers inhibited the shareholders' tender. Count I of the complaint, which was premised upon § 10b and Rule 10b–5, was dismissed pursuant to *Birnbaum* because plaintiff was not a purchaser or seller of a security. Count III in that case was directed against the stockbroker defendant and alleged violations of § 15(b)(4) and § 15(c)(1). In dismissing Count III, the Court stated:

Dismissal of the first count requires *for the same reasons* that the third count be dismissed. *Iroquois, supra* at 970. (Emphasis added).

The *Birnbaum* rule was again applied in an action under § 15(c)(1) in *Smachlo v. Merrill, Lynch, Pierce, Fenner & Smith,* [1970–71 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,148 (S.D.N.Y.1971) (§ 15(c)(1) action against the "prospective managing underwriter" dismissed because defendant did not induce the purchase or sale of any security by the plaintiffs).

■ The "tender offer plaintiffs" in the instant case are described, in part, as those who elected not to sell their shares in the Company. Their failure to make the requisite sale is fatal to their maintaining an action under § 15(c)(1). Their claims against Thomas and Interstate under Count III will thus be dismissed, while the claims of the "purchaser plaintiffs" against Thomas and Interstate survive the motion under consideration.

## COUNT IV

This count is premised upon defendants' primary or secondary violations of N.C.Gen. Stat. § 55–35. That section provides, in part, that "officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders . . ." The standard by which the fiduciary's conduct is measured is also set forth in § 55–35:

Officers and directors . . . shall discharge the duties of their respective positions in good faith, and with that diligence and care which ordinarily prudent men would exercise under similar circumstances in like positions.

The shareholder plaintiffs contend that Bagley, Gilley and Riggsbee are primarily liable to them by virtue of § 55–35. The other defendants are alleged to have aided and abetted Bagley, Gilley and Riggsbee in their allegedly wrongful conduct.

Defendants, collectively, have urged upon the Court two arguments in support of dismissal of Count IV. First, defendants assert that the shareholder plaintiffs' cause of action, if any there be, is in favor of the corporation rather than individual shareholders. From this premise it is argued that the shareholder plaintiffs failed to make or allege a demand upon the corporation which is a prerequisite to a derivative action under North Carolina law and Fed.R.

Civ.P. 23.1. The defendants other than Bagley, Gilley and Riggsbee argue secondly that they may not be held accountable under § 55–35 because the statute, by its terms, imposes a duty only upon officers and directors.

■ With respect to defendants Bagley, Gilley and Riggsbee, the only pertinent issue is whether the amended complaint alleges an individual or derivative cause of action. For the reasons which follow, the Court is of the view that the shareholder plaintiffs have alleged an individual, rather than derivative, cause of action. Demand upon the corporation was thus not a prerequisite to prosecution of their claims.

Distinguishing between derivative rights and individual rights is often a difficult task. A suit against the corporation's officers and directors for breach of their fiduciary duty on account of mismanagement is clearly derivative. Defendants have cited numerous cases consistent with that proposition. *See e. g. Goodwin v. Whitener*, 262 N.C. 582, 138 S.E.2d 232 (1964); *Parrish v. Brantley*, 256 N.C. 541, 124 S.E.2d 533 (1962).

The amended complaint, unlike the aforecited cases, alleges an injury to the shareholder plaintiffs, rather than to the corporation. Several officers and directors are alleged to have breached the fiduciary duty owed to shareholders by maintaining the market price of the Company's shares at artificial levels and in issuing false or misleading financial statements. The shareholder plaintiffs would, in the Court's view, be entitled to receive any recovery under these allegations and the action is thus individual. *Underwood v. Stafford*, 270 N.C. 700, 155 S.E.2d 211 (1967).

■ In *Underwood, supra*, the plaintiff sought recovery upon a prior judgment by attacking what was alleged to have been a fraudulent conveyance by the corporation. In distinguishing that claim from an individual right, the court stated:

> If the cause of action were founded on injuries peculiar or personal to plaintiff himself, so that any recovery would not

pass to the corporation, and indirectly to other creditors, the cause of action could have been properly asserted by plaintiff; however, where the alleged breach or injuries are based on duties owed to the corporation and not to any particular creditor or stockholder, the creditor or stockholder cannot maintain the action without a demand on the corporation, or its receiver if insolvent, to bring the suit and a refusal to do so, and a joinder of the corporation as a party.

*Id.*, 155 S.E.2d at 213. The alleged market manipulation may, of course, have been a breach of the duty owed to both the corporation and the stockholders. The same conduct may, however, create both derivative and individual claims. *See, e. g., J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The shareholder plaintiffs' injury, *i. e.*, inducement to either hold or purchase shares in the Company as a result of the alleged scheme, is peculiar to them.

There are also allegations that the Company's officers and directors caused or permitted certain false or misleading financial reports to be published. This, too, presents an individual claim. *Houston v. Thornton*, 122 N.C. 365, 29 S.E. 827 (1898). Plaintiff, in *Houston*, there alleged that she was induced to purchase shares in a national bank in reliance upon false financial statements which defendant directors negligently permitted to be published. The court rejected the defendants' argument that the right of action belonged to the bank and thus devolved upon its receiver. The negligence alleged was not a wrong to the corporation but was, instead, "a wrong to the plaintiff in permitting a false and fraudulent statement of the condition of the bank to be published . . . ." *Id.*, 29 S.E. at 828.

*Houston, supra* antedated § 55–35 but this statute has been held to have merely codified North Carolina common law principles. *Fulton v. Talbert*, 255 N.C. 183, 120 S.E.2d 410 (1961). Although the issue is not free from doubt, the Court is of the opinion that *Houston, supra* was predicated upon the fiduciary duty owed by directors to

stockholders.[26] The court spoke of the directors' "Duty to Know" and the fact that plaintiff justifiably relied upon their good character and position. *Id.*, 29 S.E. at 828 and 829. Defendants Bagley, Gilley and Riggsbee are thus amenable to suit under N.C.Gen.Stat. § 55–35 upon the present posture of this case.

 The remaining defendants have repeated their arguments leveled at Count III, *supra, i. e.*, there may not be aiding and abetting liability where the statute is written so as to exclude primary liability. The Court is unaware of any North Carolina decision which construes the liability of non-officers and non-directors under § 55–35. The Court is satisfied, however, that the North Carolina Supreme Court would recognize an action against these defendants.

In support of their cause of action the shareholder plaintiffs have cited Restatement of Torts, § 876(1939). That section provides, in pertinent part:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> \* \* \* \* \* \*
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. . . .

The North Carolina Supreme Court has approved of Restatement § 876 and its theory thus is incorporated into the state's common law. *Boykin v. Bennett*, 253 N.C. 725, 118 S.E.2d 12 (1961).

Defendants' reliance upon *Equity Funding Corp., supra* is misplaced. The shareholder plaintiffs need not demonstrate that all defendants are amenable to suit under § 55–35. Rather, non-officers and non-directors may, by North Carolina common law principles, be held to answer for substantially assisting or encouraging another's breach of fiduciary duty. The existence of

such a common law remedy distinguishes the analysis of Count III and Count IV of the amended complaint.

## COUNT V

This count rests upon allegations of common law fraud. The "tender offer plaintiffs" contend that defendants fraudulently induced them not to tender their shares pursuant to the *Shaffner* settlement. The "purchaser plaintiffs" allege that defendants fraudulently induced them to purchase shares in the Company. Both sub-groups comprising the "shareholder plaintiffs", in effect, allege that they were deceived as to the actual value of the Company's stock.

Defendants have attacked the sufficiency of Count V on several grounds. It is contended that an action for common law fraud is inappropriate for a class action. Part and parcel of that argument is whether individual reliance by the plaintiffs is an element of a common law fraud action. The amended complaint alleges reliance by the plaintiffs. The Court thus considers defendants' argument to be more appropriately addressed with regard to class certification. That question is beyond the scope of the issues which the Court addresses herein.

Defendants also contend that the amended complaint has not met the particularity requirement of Rule 9(b). This issue has previously been addressed.[27] The Federal Rules provide for liberal discovery and other pretrial procedures which afford a more appropriate remedy than dismissal.

Defendant Interstate additionally argues that price and volume fluctuations resulting from market manipulation does not constitute a representation upon which to base an action for fraud. *McGlynn v. Seymour*, 14 Daly 420 (N.Y.C.P.1888) is cited in support of this proposition. That proposition ignores the well-recognized notion that fraud

---

**26.** Although there may be some doubt regarding the basis for holding the directors liable in *Houston, supra*, the answer would not alter the Court's conclusion that it stands for the proposition that the cause of action was an individual one.

**27.** See text accompanying n.12 through n.14, *supra*.

may be predicated upon suppression or concealment as well as misrepresentation. Further, the complaint alleges the publication of false financial documents. Finally, the question of whether plaintiffs may establish a misrepresentation is one which at this point is premature.

## COUNTS VI AND VII

Count VI alleges a violation of this Court's 1973 judgment in *Shaffner.* Count VII is based upon an alleged violation of the *Shaffner* "Agreement of Settlement". Because the judgment incorporated the "Agreement" by reference, Counts VI and VII may be considered together.

The allegations may be considered as being premised on either of two theories of liability. The amended complaint (particularly Count VII) and plaintiffs' brief in opposition may be read as pursuing a remedy for interference with contractual rights. In that regard the shareholder plaintiffs have cited Restatement of Torts, § 766 (1939),[28] and *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954).

*Childress, supra* stated the elements of an action for interference with contract, thusly:

> The plaintiff must allege and prove these essential elements of the wrong: *First*, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. *Second*, that the outsider had knowledge of the plaintiff's contract with the third person. *Third*, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. *Fourth*, that in so doing the outsider acted without justification. *Fifth*, that the outsider's

act caused the plaintiff actual damages. *Id.,* 84 S.E.2d at 181–82 (citations omitted) (emphasis in original).

These elements were reaffirmed in *Smith v. Ford Motor Company*, 289 N.C. 71, 221 S.E.2d 282 (1976).

The shareholder plaintiffs argue that the requirement of an existing contract is satisfied by the *Shaffner* judgment/settlement agreement. The "purchaser plaintiffs" were not parties to *Shaffner* or the "contract" which it produced, and thus Counts VI and VII must be dismissed as to them.[29]

A review of the judgment/settlement reveals that the Company, and not any of the other *Shaffner* defendants, was required to make the offer to purchase the shares of the "tender offer plaintiffs". This is in marked contrast to the gist of the "tender offer plaintiffs' " allegations. The amended complaint is premised upon the "tender offer plaintiffs' " right to receive that offer free from any scheme of market manipulation. The instant defendants are alleged to have induced the "tender offer plaintiffs" not to accept the Company's offer.

That is not to say, however, that defendants "intentionally induced the third person not to perform his contract." Indeed, the amended complaint does not allege that the Company failed to perform its obligation under the judgment/settlement agreement.[30] The amended complaint thus fails to state a cause of action under *Childress, supra.*

The allegations against the instant defendants in Counts VI and VII are, in essence, that a market manipulative scheme induced the "tender offer plaintiffs" not to

---

**28.** *Restatement of Torts* § 766 (1939) provides, in pertinent part:

> [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another . . . is liable to the other for the harm caused thereby.

**29.** Count VII is limited to the "tender offer plaintiffs". Count VI, on the other hand, is brought on behalf of the "plaintiffs".

**30.** The amended complaint does state that defendants Bagley and Gilley held a controlling interest in the Company. There are no assertions, however, that the corporate status should be disregarded so that their misconduct, if any, be attributed to the Company.

exercise their *Shaffner*-created rights. So viewed, the allegations are identical to the common law fraud claim of Court V. Counts VI and VII will, therefore, be dismissed.

## COUNT VIII

■ The amended complaint here alleges that the "tender offer plaintiffs" were fraudulently induced to accept the *Shaffner* agreement and that the Court was fraudulently induced to approve the settlement.

Several defendants have challenged the sufficiency of Count VIII as measured by the particularity requirements of Rule 9(b). It is again argued that an action grounded in fraud is inappropriate for class action resolution. Several defendants seek dismissal on the ground that they were not parties to *Shaffner*. An interesting argument is also advanced in support of dismissal that the "tender offer plaintiffs" could not have been damaged even by a stock manipulation plan prior to the *Shaffner* settlement. Defendant Johnston avers that the amended complaint does not allege that his involvement preceded the settlement.

Paragraph 126 is the only reference in the amended complaint, of which the Court is aware, that mentions fraudulent inducement in connection with the settlement. Other paragraphs of the amended complaint, however, allege the component parts of the alleged manipulative scheme, the actors, in several instances the approximate time frame and defendants' objectives for the scheme. At the risk of repeating matters stated, *supra*, the Court is of the view that Rule 9(b) must be construed in light of Rule 8. For the aforementioned reasons the Court is satisfied that the "tender offer plaintiffs" have pleaded the circumstances of the alleged fraud with sufficient particularity.

Whether Count VIII presents a claim appropriate for class action determination is a question more appropriately addressed at a later time. As with Count V, this aspect will be addressed when the motion for certification is considered.

The defendants' remaining arguments as to this count must also fail, given the present posture of this litigation. The "tender offer plaintiffs" are entitled to every reasonable inference. It may ultimately be shown that defendants fraudulently induced the settlement and approval even though they were not parties to *Shaffner*. Similarly, it may be shown that the "tender offer plaintiffs" were damaged by the alleged market manipulation plan prior to the *Shaffner* settlement. Finally, it may be shown that defendant Johnston's alleged involvement was prior to the conclusion of *Shaffner*.

## COUNT IX

■ Count IX is the first of four counts asserted by the Reorganization Trustee. This count is premised upon the alleged breach of fiduciary duty by defendants Bagley, Gilley and Johnston. The fiduciary duty is said to arise from N.C.Gen.Stat. § 55–35 and common law. As will appear from the following summarization of Count IX, no claim is asserted against any other than the aforementioned defendants. Accordingly, defendants Riggsbee, Northwestern, Chapple, American, Wheat, Interstate, Thomas and Pullen are entitled to dismissal on Count IX.

The amended complaint in this count alleges that in 1973 defendants Bagley and Gilley, on behalf of the Company, negotiated for the purchase of Johnston Mills Company. Defendant Johnston was the principal shareholder, president and chief executive officer of Johnston Mills Company.

It is further alleged that in addition to the price paid for Johnston Mills Company shares, defendant Johnston received other valuable consideration. First, it is contended that defendant Johnston received a lucrative eighteen year employment contract with the Company providing for direct payments of 5.75 million dollars and fringe benefits of $600,000 over that period. Second, defendant Johnston and his wife received $500,000 in exchange for a five year option to purchase 762 acres of undeveloped land. The sales price is alleged to

have been twelve million dollars, even though the actual value of the property was considerably less. The option was never exercised. Defendant Johnston is also alleged to have been given a lease and option to purchase a home at Blowing Rock, North Carolina for $16,000 at a time when its fair market value was $75,000 to $125,000. It is lastly alleged that defendants Bagley, Gilley and Johnston consummated a sale of The Johnston Building to Johnston Building, Inc. and that the Company thereafter rented office space in and paid for renovations to the building. Defendant Gilley is alleged to have owned 50% of the shares in Johnston Building, Inc.

Defendant Gilley seeks dismissal of Count IX upon the authority of the North Carolina business judgment rule, *see e. g. F. F. Milling Co. v. Sutton*, 9 N.C.App. 181, 175 S.E.2d 746 (1970); *Security Bank v. Bridgers*, 207 N.C. 91, 176 S.E. 295 (1934), and the insufficiency of the allegations against him. Neither argument is persuasive. Application of the business judgment rule defense necessarily depends upon the facts as developed at trial and is thus an inappropriate ground for dismissal at this stage. Further, the amended complaint alleges a breach of fiduciary duty with regard to specific transactions. The trustee is entitled to all reasonable inferences and defendant Gilley has been afforded notice of the nature of the claims.

Defendant Bagley notes that each of the transactions in question was between the Company and either defendants Gilley or Johnston. There is no allegation that Bagley benefitted from the transactions. Contrary to Bagley's assertion, however, it still may be shown that he violated a fiduciary duty. Count IX survives as to defendant Bagley, too.

Defendant Johnston seeks dismissal upon two grounds. First, he argues that there is no allegation that he was an officer, director, employee or shareholder of the Company. Paragraphs 31, 131 and 132, however, allege that defendant Johnston was a Company employee and an officer and principal shareholder of one of its subsidiaries.

Defendant Johnston also argues that he dealt with the Company on an arm's-length basis. This, however, presents an issue of fact which is unavailing in a motion to dismiss.

## COUNT X

Similar to the preceding count, Count X seeks relief from but three defendants; Bagley, Gilley and Riggsbee. The remaining defendants are thus entitled to dismissal of Count X.

 Succinctly stated, Count X makes several allegations of corporate mismanagement or waste against Bagley and Gilley. The trustee asserts that Bagley and Gilley caused the Company to acquire Johnston Mills Company, Inc. and Diener Corporation at a time or under such circumstances as to cause the Company's debt to become unmanageable. It is also alleged that Bagley, with the concurrence and approval of Gilley, ordered the Company's salesmen to ignore prudent debt limitations which resulted in the Company incurring excessive uncollectable accounts receivable. Bagley, with the approval and concurrence of Gilley, is also alleged to have wrongfully demanded higher prices from one of the Company's better customers, resulting in the customer ceasing its business relationship with the Company. The trustee further contends that Bagley, with the concurrence and approval of Gilley, ordered that lavish offices be established at a time when the Company was heavily in debt, and that Bagley and Gilley subsequently treated such property as their own. The amended complaint also challenges a ten year consulting contract between the Company and Bagley.

The allegations as to defendant Riggsbee arise from the Company's sale of certain Virginia property to B. C. L. Enterprises, Inc. ("BCL"). The sale was allegedly consummated at the direction of Bagley and Gilley. BCL's sole shareholder is alleged to have been defendant Riggsbee, who was, at that time, an officer and director of one of the Company's subsidiaries. The trustee also contests the dealings between the Com-

pany and BCL with respect to the property subsequent to the sale.

While other allegations are made in Count X, the foregoing is sufficient for purposes of the instant motion. The trustee seeks monetary relief on behalf of the Company from each of these three defendants.[31] The trustee additionally seeks a declaration that the Bagley consulting contract is either void or has been breached by that defendant. Bagley and Gilley are alleged to have breached common law and statutory (N.C.Gen.Stat. § 55–35) fiduciary duties. Regrettably, the trustee did not state his theory for recovery against Riggsbee.

Each of the defendants have challenged the pleading sufficiency of Count X. The allegations are, at best, vague and conclusory. The Court declines to dismiss Count X on this ground, however, for the Trustee's claims and the notice to which defendants are entitled may be fleshed out by discovery and other pretrial procedures. In the absence of such fleshing out, the motion as to this count is subject to reconsideration.

Defendants Bagley and Gilley also seek dismissal of this count by virtue of the state law business judgment rule. There is little doubt that the business judgment defense may be particularly appropriate as to allegations such as those encompassed in Count X. Emphasis should be placed on the word "may", however, for the success of that defense is dependent upon the proof adduced at trial. The argument is, therefore, unpersuasive.

According the Trustee all reasonable inferences also dictates against dismissal as to defendant Riggsbee. It is conceivable that a claim may be proven as to Riggsbee despite the Trustee's failure to join BCL in Count X, and despite the fact that the realty in question has been reconveyed to the Company.

## COUNT XI

Count XI alleges that defendant Gilley wrongfully caused the Company to issue checks for $35,000, $4,000, and $4,000 to him between April 1, 1977 and June, 1977. The checks were allegedly issued without the approval of the Company's Compensation Committee or Board of Directors, and are claimed to have been in addition to Gilley's regular salary. There is the further allegation that Gilley caused the Company to issue a $15,000 check to the Company's chief financial officer; again without the approval of the Board of Directors or Compensation Committee. Count XI also alleges that Gilley unlawfully benefited at the Company's expense with respect to various trips, office furniture and satisfaction of personal obligations.

Gilley does not appear to seriously contest the allegations regarding alleged improper issuance of Company checks.[32] The motion to dismiss this count is thus premised on the failure of the Trustee to specify, as alleged, which trips or personal obligations of Gilley were improperly paid by the Company. For the reasons stated in previous counts, the Court declines to dismiss on this basis.

The Trustee seeks no relief from any defendant other than Gilley on Count XI. This count will, therefore, be dismissed as to the remaining defendants.

## COUNT XII

The Trustee's final claim arises from the Company's payment of attorney's fees in the *Shaffner* litigation. The settlement agreement and the Court's judgment provided that the Company would pay the *Shaffner* plaintiffs' attorney's fees. A March 12, 1973 resolution of the Company's Board of Directors further provided that the Company's officers and directors be indemnified as to their legal expenses in connection with *Shaffner*. The Trustee contends that had the court, and the Company, been aware of the alleged wrongdoings of

---

**31.** The trustee prays for monetary relief against defendant Riggsbee only with respect to the sale and subsequent dealings between the Company and BCL.

**32.** Gilley's brief in support of motions to dismiss states, at page 7: "Hence, the allegations with regard to defendant Gilley's and Dr. Smith's compensation would seem sufficient."

Bagley and Gilley, and the instant defendants acting in concert therewith in aiding and abetting Bagley and Gilley, the latter defendants would have been required to shoulder the aforementioned expenses.

Defendant Bagley argues that the complaint, on its face, establishes that the Company's payments were legitimate expenses. The Court disagrees. Count XII alleges that the payments were not properly made by the Company by virtue of Bagley's alleged breach of his fiduciary duty. Bagley further argues that the Trustee's counsel is, in effect, stating a claim against himself since he was plaintiff's counsel in *Shaffner*. Even if there exists a conflict of interest, and the Court does not so hold, the fact remains that the Company seeks recovery from Bagley.

Defendant Gilley's arguments in favor of dismissal are extensions of a res judicata defense. Those arguments would possibly be convincing if it is determined that *Shaffner* may not be reopened. That decision, however, must await another day. *See, infra.*

Many of the remaining defendants contend that Count XII is fatally defective by reason of its failure to incorporate those paragraphs of the amended complaint in which their alleged actions are set forth. For example, Wheat's alleged misconduct in developing merger ratios is set forth in paragraphs eighty-six and eighty-seven, which are not incorporated into Count XII.

 The defendants' arguments appear to be well taken in a *technical* sense. However, pleadings are to be construed so as to render substantial justice. Further, Count XII does allege that the alleged wrongs of all defendants arose from their conduct in the Washington Mills—CSI merger, the alleged market manipulation scheme, or both. Those allegations essentially refer to the individual conduct described in specific paragraphs. The Court thus declines to dismiss on that basis. The alternative—dismissal with leave to amend—constitutes a burden on the Trustee without a correspondent benefit to the defendants.

Defendant Northwestern emphasizes that its conduct with respect to the Company's employee benefit plans is alleged to have occurred post-*Shaffner*. The Court agrees that Count XII may not embrace misconduct subsequent to *Shaffner* and the resolution of March 12, 1973. The evidence will be limited accordingly at trial. Northwestern remains a defendant under Count XII, however, in connection with the allegations of stock purchase loans.

The defendants' final contention is that those who were not parties to *Shaffner* or who had no role in the settlement, may not be held to answer to Count XII. The allegation of this count, however, is that defendants participated in a scheme to fraudulently conceal Bagley and Gilley's wrongdoing from the Court and the Company. The Court cannot determine, as a matter of law, that the Trustee cannot recover on that theory. Dismissal of this count is thus inappropriate.

## RES JUDICATA

Several defendants argue that the "tender offer plaintiffs'" claims are barred by the companion doctrines of res judicata or collateral estoppel. Defendants who were also parties to *Shaffner* assert the former defense. Collateral estoppel is argued by non-*Shaffner* defendants. Under certain circumstances, a defendant may raise a preclusion defense even if he was not a party to the prior action. It is, in the Court's view, unnecessary to determine whether the non-*Shaffner* defendants may argue collateral estoppel at this time.

 The judicial and social policies supporting the preclusion doctrines are well-stated in the briefs and are of such universal recognition that a detailed discussion of these policies is inappropriate. *See e. g. Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). The Court additionally doubts that there is serious dispute regarding the general application of res judicata. A question of fact or legal right, once determined, may not be relitigated even if a later suit between the same parties states a different cause of

action. *United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). The preclusion doctrines will also operate against all claims that *could* have been asserted in the first action. *Johnson v. United States*, 576 F.2d 606, 611 (5th Cir. 1978). A consent judgment, such as that entered in *Shaffner*, may constitute a decision on the merits to which res judicata may attach. 1B Moore's *Federal Practice* § 0.409[5].

Res judicata and collateral defenses are affirmative defenses. Fed.R.Civ.P. 8(c). They are appropriately raised by a motion to dismiss, however, when the defense appears on the face of the complaint. *Davenport v. Deseret Pharmaceutical Co.*, 321 F.Supp. 659 (E.D.Va.1971); Wright & Miller, *Federal Practice and Procedure*: *Civil* § 1357. In the instant case the *Shaffner* settlement and judgment is incorporated by reference in the amended complaint.

In their brief in opposition to the motions to dismiss, the "tender offer plaintiffs" have characterized their complaint in a manner directed to avoid the effect of the preclusion doctrines. The "tender offer plaintiffs" first contend that the instant suit is based, in part, upon defendants' alleged violations of the *Shaffner* settlement and judgment. These plaintiffs further argue that they are not precluded from prosecuting this action since they seek a rescission of the *Shaffner* settlement agreement and judgment.

The "tender offer plaintiffs" should be permitted to maintain an action to enforce the terms of this Court's judgment in *Shaffner*. These claims would, necessarily, have to be embraced by Count IV of the amended complaint.[33] The amended complaint alleges wrongdoing subsequent to the Court's judgment, *see e. g.* ¶ 67, and it would be inappropriate to dismiss plaintiffs' claim at this time. It would seem, however, that the "tender offer plaintiffs" would,

under this theory, be limited to offering evidence of wrongdoing subsequent to the judgment, rather than the settlement.[34]

The Court is also concerned with the "tender offer plaintiffs" rescission theory and the prayer for relief to that effect. If rescission is granted, the "tender offer plaintiffs" would relitigate their *Shaffner* claims in addition to those alleged in the amended complaint. The Court's primary concern is a practical one. It would be unduly time consuming, with an attendant risk of prejudice, to permit these plaintiffs to proceed at trial with evidence on the *Shaffner* claim if it were to then be determined that no ground for rescission was shown. The Court thus solicits the suggestions of counsel as to whether a problem of this sort is actually presented, and if so, the appropriate manner in which it should be addressed to minimize any wrongful prejudice as well as to conserve judicial time and unnecessary monetary cost to the litigants. A suggested starting point may well be a definitive determination by plaintiffs as to whether they do indeed seek a reopening of *Shaffner*. See the Court's discussion, *infra*, reference "Indispensable Parties".

The parties should also consider whether the acts of some, but not all, of the *Shaffner* defendants, may constitute grounds for reopening the suit as to all those defendants. If not, it must be decided whether a release of some defendants would bar prosecution of all defendants.

The uncertainties regarding application of res judicata are no more evident than with regard to defendant Wheat. In *Shaffner* Wheat was charged with wrongdoing in connection with the merger ratio in the Washington Mills—CSI merger. That is the sole allegation with respect to Wheat in the instant action. Wheat had no duty under the *Shaffner* settlement or judgment

---

**33.** Only Counts IV, V and VIII remain as to the "tender offer plaintiffs". Counts VIII and V are allegations of fraudulent inducement which would not be embraced by a breach-of-settlement theory. Count IV is premised upon the fiduciary duty owed by officers and directors,

and it, too, is a questionable basis for this theory.

**34.** The settlement agreement was conditioned upon the approval of the court. Further, the settlement agreement, like the cause of action, merged into the judgment.

which it could breach. Nor could the merger ratio be actionable under either of the inducement counts, for the alleged wrong was obviously known to the "tender offer plaintiffs." Those plaintiffs must be contending that Wheat otherwise participated in a scheme to induce approval of the settlement and judgment or breach thereof. While dismissal of the claims against Wheat would, at this time, be premature, the Court is reluctant to burden a party with trial preparation when its potential liability is in such doubt as a matter of law.

The foregoing discussion of the potentialities in reference to the well recognized preclusion doctrines will hopefully be of some aid to counsel in preparation for a further pretrial conference with the trial judge. All counsel are, in the interest of justice, encouraged to meet and confer with the view in mind to separate the chaff from the wheat as to the controlling issues in this obviously complex litigation.

## PUNITIVE DAMAGES

The shareholder plaintiffs and the Trustee each seek an award of twenty million dollars as punitive damages. The defendants have moved to strike this portion of the prayer for relief.[35] For the reasons which follow, the Court is of the view that the motion to strike must be granted in part, and denied in part.

There does not appear to be a genuine dispute as to whether punitive damages may be recovered upon a violation of the federal securities laws. That issue has been addressed and answered in the negative. *Carras v. Burns*, 516 F.2d 251 (4th Cir. 1975); *Globus v. Law Research Services, Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969). The prayer for punitive damages must therefore be struck as to each of the counts brought under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*

A more complex issue which must be addressed is whether the plaintiffs may, nonetheless, seek punitive damages under the pendent claims which have been joined with the federal law counts. Defendants contend that such recovery is prohibited by § 28(a) of the Act, 15 U.S.C. § 78bb(a). Other courts which have addressed the issue have reached conflicting conclusions, and the question has been left open in this circuit. *Carras, supra* at 260.

> Section 28(a) provides, in pertinent part:
> The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

The defendants interpret § 28(a) as preserving common law and statutory remedies while limiting recovery thereunder to actual damages. The Court disagrees.

State law and common law rights survive enactment of a federal statute unless they are specifically preempted or in conflict with the federal law. *Ray v. Atlantic Richfield Company*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). There is no indication in § 28(a) of an intent to limit the recovery available under state or common law causes of action. If anything, the section's limitation to actual damages is applicable to "a suit for damages under the provision of this chapter." Congress could have provided the meaning advanced by defendants by simply omitting that qualification. The Court's conclusion is that Congress sought to limit recoveries only with regard to suits under the Act. *Cf. Schaefer v. First National Bank of Lincolnwood*, 326 F.Supp. 1186, 1193 (N.D.Ill.1970), *appeal*

---

**35.** As part of his motion to strike, defendant Gilley has moved to strike paragraphs 51 through 60 and paragraph 87 of the Amended Complaint. Gilley contends that those paragraphs are "patently irrelevant and immaterial." Those paragraphs recite allegations pertaining to the Washington Mills—CSI merger. The allegations are neither irrelevant nor immaterial, especially if plaintiffs elect and are permitted to reopen the *Shaffner* suit. The motion will, therefore, be denied.

*dismissed* 465 F.2d 234 (7th Cir. 1972) ("Although common law remedies are expressly reserved, the conclusion is unavoidable that common law damage rules permitting recovery in excess of actual damages have not been saved.")

Admittedly, § 28(a) may be construed as limiting the possible recovery to anyone "*permitted* to maintain" an action under the 1934 Act even if that plaintiff is prosecuting a different cause of action. That reading of the statute would preclude a claim for punitive damages upon a pendent claim, as here. However, it would also preclude a prayer for punitive damages in a state court action, e. g. common law fraud, unless the plaintiff could prove a negative, *i. e.*, that he could not maintain an action under the Act. The Court refuses to adopt a construction which would result in such a far-reaching, and in the Court's view, inequitable, consequence.

Defendants further rely upon a passage from the House Report explaining § 28(a). There it is said

This subsection reserves rights and remedies existing outside of those provided in the act, but limits the total amount recoverable to the amount of actual damages. H.R.Rep.No.1383, 73rd Cong., 2d Sess. 28 (1934).

Defendant Interstate argues that no court which has permitted a claim for punitive damages upon a pendent claim has considered the passage quoted above. However, the United States Court of Appeals for the Tenth Circuit, (which prohibited a claim for punitive damage) stated that the legislative history does not provide any real solution. In fact, it may be read to support several alternative interpretations. *deHaas v. Empire Petroleum Company*, 435 F.2d 1223, 1230 (10th Cir. 1970).

The most persuasive argument advanced by the defendants finds its principal support in *Kerby v. Commodity Resources, Inc.*, 395 F.Supp. 786 (D.Colo.1975). The district court there declined to exercise pendent jurisdiction over claims which included a prayer for punitive damages. The court in *Kerby, supra* stated that the limitation on

the federal remedy "may well be the motivating reason for the type of joinder of claims made in this complaint and which has become typical in this kind of litigation." *Id.* at 790. The ruling was thus predicated upon the court's discretion rather than a finding of preemption. That analysis appears to be consistent with the reasoning in *deHaas, supra* at 1232. ("Considering the potential problems involved . . . we have concluded that punitive damages should not be allowed in a private action under Rule 10b–5"). So viewed, *Kerby* is more properly considered with reference to the *exercise* of pendent jurisdiction rather than the issue presently under discussion.

*deHaas, supra* did not address the punitive damages issue in the context of pendent claims. The Tenth Circuit addressed that issue in *Young v. Taylor*, 466 F.2d 1329, 1337–38 (10th Cir. 1972) and permitted an award of punitive damages for common law fraud.

Defendants also rely upon *Schaefer, supra*. This Court does not find the *Schaefer* conclusion "unavoidable" and respectfully declines to follow its ruling; as did a court in the same district, *see Burkhart v. Allson Realty Trust*, 363 F.Supp. 1286, 1290–92 (N.D.Ill.1973).

In summary, the Court interprets § 28(a) of the Act as preserving state law and common law remedies and the measure of damages available under each. The Court notes that its conclusion is in accord with the clear weight of authority where the specific issue has been presented. *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189 [1978 Transfer Binder] CCH Fed.Sec.L. Rptr. ¶ 96,613 (8th Cir. 1978); *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464–65 (9th Cir. 1977); *Flaks v. Koegel*, 504 F.2d 702, 706–07 (2d Cir. 1974); *Coffee v. Permian Corporation*, 474 F.2d 1040, 1044–45 (5th Cir. 1973); *Young, supra; Goodman v. Poland*, 395 F.Supp. 660 (D.Md.1975); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 393–94 (S.D.N.Y.1973).

■ Punitive damages are recoverable in an appropriate case under North Carolina law. *Oestreicher v. American National Stores, Inc.*, 290 N.C. 118, 225 S.E.2d 797 (1976) and *Clemmons v. Life Insurance Company of Georgia*, 274 N.C. 416, 163 S.E.2d 761 (1968) set forth the state law standards for such an award. The final question with respect to this issue is the sufficiency of the amended complaint's pleading. Defendant American contends that the amended complaint is insufficient in light of *Lutz Industries, Inc. v. Dixie Home Stores*, 242 N.C. 332, 88 S.E.2d 333 (1955) (". . . The complaint must allege facts showing the aggravating circumstances.") The amended complaint, however, is to be read in light of the notice pleading of the Federal Rules which do not require fact pleading. Further, ¶ 103 of the amended complaint characterizes defendants' conduct as being *inter alia*, in bad faith and reckless disregard of duties. A basis for punitive damages under state law has been alleged.

### ATTORNEYS' FEES

■ The amended complaint prays that plaintiffs be awarded attorneys' fees incurred in this litigation. In support of this claim plaintiffs rely upon long-recognized exceptions to the American Rule respecting attorneys' fees and their view of the North Carolina law on the subject. The exceptions relied upon by plaintiffs may be identified as the substantial benefit, common fund and bad faith theories. The Court has reviewed each of the cases cited by the plaintiffs, and for the reasons which follow, is of the opinion that defendants' motion to strike this portion of the complaint is well taken.

The general American Rule regarding the award of attorneys' fees was forcefully reaffirmed in *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The American Rule provides that in the absence of a statutory or contractual provision, the prevailing party is not entitled to recover his attorneys' fees as costs or otherwise. *Id.* at 245, 95 S.Ct. at 1615.

The American Rule is not without exceptions, however, and those pertinent to this action are viable even after *Alyeska, supra.* The Court may direct that attorneys' fee be recovered where the plaintiffs' maintenance of the suit confers a substantial benefit upon others. Another exception, denominated the common fund theory, permits reimbursement of the plaintiff from the recovery in the litigation. Further, attorneys' fees may be assessed against a party who is guilty of bad faith, vexatious conduct, etc. A developing exception which was specifically rejected by *Alyeska, supra* was the private-attorney-general theory:

> [C]ongressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award. *Id.* at 263, 95 S.Ct. at 1624.

The Court is of the view that none of the well-recognized exceptions is available to the instant plaintiffs.

The substantial benefit and common fund theories are related, although distinct, exceptions to the American Rule. Nevertheless, because plaintiffs' misconception as to each exception is the same, they may be treated together for the present purposes. Each of these theories rests upon the policy of preventing unjust enrichment by conferring a benefit upon those similarly situated to plaintiff who are not otherwise liable for attorneys' fees. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970). In short, those others must pay for the benefit conferred.

The classic example of the application of the substantial benefit and common fund theories is the stockholder derivative suit. The corporation may be ordered to reimburse the plaintiff for attorneys' fees, not because it was an unsuccessful litigant, but because the prevailing plaintiff has vindicated a corporate right. Likewise, if the

plaintiff and, *e. g.* his class, are awarded a monetary recovery the plaintiff may be reimbursed by a *pro rata* reduction in each class member's share in the common fund.

The point which is fatal to plaintiffs' argument is that in each case the reimbursement for attorneys' fees is made by the party benefited, *e. g.* the corporation, or from a common fund in which other beneficiaries are entitled to share, *e. g.* class members. *Mills, supra* at 389–90, 90 S.Ct. at 624–625. These exceptions to the American Rule do not, and were never intended to, shift the litigation expenses of the prevailing party to his unsuccessful adversary. *Mills, supra* at 396–97, 90 S.Ct. at 627–628; *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 995 (7th Cir. 1976). This is precisely what the plaintiffs seek to do by their prayer for attorneys' fees against defendants. This is not permitted under either the American Rule or the substantial benefit or common fund exceptions.

Plaintiffs alternatively base their claim for attorneys' fees upon the American Rule's bad faith exception. The plaintiffs contend that bad faith or oppressive conduct which is the basis for the cause of action is ground for an award of attorneys' fees under this exception. *Cf. Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) and *Rolax v. Atlantic Coastline Railroad Co., Inc.*, 186 F.2d 473 (4th Cir. 1951) with *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591 (3rd Cir. 1976). Defendants submit that the bad faith exception is limited to misconduct during the pendency of the suit and separate from the basis of the cause of action. The Court views this argument as an academic one which needn't be resolved here in light of the limitation of § 28(a), 15 U.S.C. § 78bb(a).

■ An award of attorneys' fees pursuant to the bad faith exception is punitive in nature. *Hall, supra*, 412 U.S. at 5, 93 S.Ct. at 1946. Penalizing the party for his misconduct is the underlying rationale for the exception. As such, an award of attorneys' fees in this case for the conduct upon which

the securities claims are based, would contravene the limitation of § 28(a). The cases cited by plaintiff are not to the contrary because the situations there presented did not include a provision comparable to § 28(a). The instant conclusion is consistent with, and is guided by, *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591 (3rd Cir. 1976).

The limitation of § 28(a) presumably would not bar an award of attorneys' fees resulting from misconduct during the course of this litigation. The punitive nature of the award would, of course, be the same. The distinction between misconduct in the litigation and *Straub, supra* lies in the fact that the award is not based upon a violation of the federal securities laws to which § 28(a) is applicable. Nevertheless, the Court will strike the prayer for attorneys' fees. The Court has no basis for the contemplation of bad faith or oppressive conduct on the part of any of these defendants, or their counsel. Indeed, the Court places great confidence in all counsel of record in this cause. Problems with discovery, if they arise, may be dealt with by the sanctions provided in the Rules, and, if necessary, further amendment of the prayer would be in order.

■ There remains, however, the question as to whether attorneys' fees are recoverable under North Carolina law for the pendent claims. Section 28(a) would not prohibit such an award. *Young, supra* at 1338. The Court is of the opinion that attorneys' fees are not recoverable in this action under state law. In *Perkins v. American Mutual Fire Insurance Co.*, 4 N.C. App. 466, 167 S.E.2d 93, 95 (1969) the Court of Appeals of North Carolina stated:

The general rule is that, in the absence of any contractual or statutory liability therefor, attorney fees and expenses of litigation incurred by the plaintiff or for which plaintiff is obligated to pay in the litigation of his claim against the defendant, are not recoverable as an item of damages, either in a contract or a tort action.

The court in *Perkins, supra*, noted that North Carolina had, in 1879, shifted from a

position of permitting recovery of attorneys' fees as costs.

Plaintiffs have not referred the Court to any applicable North Carolina statute authorizing an award of attorneys' fees. Plaintiffs have instead relied upon *Oestreicher, supra* and its approval of 22 Am. Jur.2d, *Damages*, § 236. Section 236, however, is nothing more than a definitional section and *Oestreicher, supra* cited it solely for that proposition. Plaintiffs have further argued that attorneys' fees may be considered by the jury in fixing punitive damages. *See* 22 Am.Jur.2d, *Damages*, § 263. Whether the jury may be so instructed under North Carolina law is an issue which needn't be decided here, and is, in any event, no basis for resisting the motion to strike the claim for attorneys' fees. That question relates solely to the scope of a possible punitive damages award, not an award of attorneys' fees in and of itself.

## SEVERANCE OF THE TRUSTEE'S CLAIMS

Several defendants have moved that Counts IX through XII be either dismissed as improvidently joined with, or in the alternative, severed from those of the shareholder plaintiffs. The motions to sever Counts IX, X and XI have some surface appeal with respect to those defendants against whom the shareholder plaintiffs assert theories of secondary liability. This initial opinion is based upon the fact that the alleged misconduct on their part was apparently entirely legal, absent proof of the technical elements of aider and abettor liability, *e. g.* stock purchase loans and purchases of stock by pension trusts.

Motions under the Rules here applicable are entrusted to the sound discretion of the trial court. Granting or denying the instant motions would obviously have a substantial impact upon the conduct of the trial. In recognition of these factors it is prudent to continue these motions under advisement for a determination by the judge who will preside over this matter. Needless to say, the initial views as to severance encompassed in this memorandum should not be construed as suggesting in any manner the ultimate conclusion to be reached by the trial judge.

## PERSONAL JURISDICTION

Defendants Bagley and American seek dismissal of the amended complaint for want of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). Bagley asserts that he has resided in Washington, D.C. since 1975 and does not maintain an office in North Carolina. American emphasizes that it is not authorized to do business in North Carolina, in fact does not transact business in the state, and that its relations with the Company occurred in Pennsylvania. Thus it is argued that there is no basis for application of the North Carolina long-arm statute and that the minimum guarantees of due process as espoused in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) have not been satisfied.

Fed.R.Civ.P. 4(f) provides that process may be served anywhere within the territorial limits of the state in which the district court is held and, "when authorized by a statute of the United States . . . beyond the territorial limits of that state." Rule 4(f) thus recognizes the power of Congress to provide for nationwide service of process to enforce a federal right. *Mississippi Publishing Corporations v. Murphree*, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946). Congress' authority rests upon the fundamental right of a sovereign to exercise jurisdiction over any defendant within its territory. *First Flight Co. v. National Carloading Corporation*, 209 F.Supp. 730, 736 (E.D.Tenn.1962).

Congress has provided for the expanded service of process contemplated by Rule 4(f) in several instances, including the 1934 Act. Section 27 of the Act, 15 U.S.C. § 78aa provides, in pertinent part:

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such

district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. Service upon Bagley at his home in Washington, D.C. and upon American in Pennsylvania was thus permissible under § 27.

Defendants' assertions with regard to the North Carolina long-arm statute are thus unavailing. The 1934 Act affords the basis for personal jurisdiction over the defendants with respect to the shareholder plaintiffs' securities claims. Equally unpersuasive is defendants' reliance upon *International Shoe, supra* and its progeny. The minimum contacts rationale addressed the state court's extraterritorial assertion of jurisdiction. In the instant case the sovereign—the United States of America—is not seeking to extend its judicial power beyond its boundaries. *Cf. S. E. C. v. Myers*, 285 F.Supp. 743 (D.Md.1968) (minimum contacts must be established even under § 27 for the district court to exercise in personam jurisdiction over a Canadian citizen served with process in Canada.)

The Court is also of the view that § 27, in conjunction with the doctrine of pendent personal jurisdiction, provides a basis for personal jurisdiction as to the state law claims. The trend in the more recent cases has been that the personal jurisdiction acquired by extraterritorial service under § 27 is not limited to federal securities law claims. *Robinson v. Penn Central Co.*, 484 F.2d 553 (3rd Cir. 1973); *Schwartz v. Eaton*, 264 F.2d 195 (2d Cir. 1959) (dictum); *Warren v. Bokum Resources Corp.*, 433 F.Supp. 1360 (D.N.M.1977); *Bertozzi v. King Louie Intern., Inc.*, 420 F.Supp. 1166 (D.R.I.1976); *Sohns v. Dahl*, 392 F.Supp. 1208 (W.D.Va. 1975); *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191 (E.D.Pa.1974); *Getter v. R. G. Dickinson & Co.*, 366 F.Supp. 559 (D.Iowa 1973); *Allen Organ Co. v. North American Rockwell Corp.*, 363 F.Supp. 1117 (E.D.Pa.1973); 2 Moore, *Federal Practice and Procedure, Civil* § 1125. *Contra, Trussel v. United Underwriters*

*Ltd.*, 236 F.Supp. 801 (D.Colo.1964) and cases cited in *Bertozzi, supra* at 1171–72, n. 1. The Court subscribes to the notion of pendent personal jurisdiction in the instant case for it serves the purposes of both the substantive federal securities laws scheme and the practical considerations of judicial economy underlying pendent subject matter jurisdiction.

Defendants' constitutional challenge to the exercise of personal jurisdiction over them must also be rejected. In *Fitzsimmons v. Barton*, 589 F.2d 330 (7th Cir. 1979) an Oklahoman's due process challenge to the Illinois district court's personal jurisdiction was summarily dismissed:

Here the sovereign is the United States, and there can be no question but that the defendant, a resident citizen of the United States, has sufficient contacts with the United States to support the fairness of the exercise of jurisdiction over him by a United States court. *Id.* at 333. (footnote omitted).

*Fitzsimmons, supra* correctly distinguished *forum non conveniens* and the constitutional understanding of fairness in the exercise of jurisdiction. Viewing the forum as the United States, rather than the Middle District of North Carolina establishes the requisite fairness.

Even if the Fifth Amendment requires something more, it is present in this case. For all practical purposes, discovery represents the bulk of the effort in modern, complex litigation. Defendants' assertions of unfairness of litigating in a distant forum are largely muted by the realization that discovery will occur under the same conditions regardless of the forum entertaining the suit. The discovery burden, if any, is also principally borne by counsel, not the parties. Second, it is undoubted that Bagley in the past had substantial contacts with North Carolina, and American engaged in transactions with the Company, a North Carolina corporation. American must surely have known that its conduct would have greater impact with respect to the Company beyond Pennsylvania than within. Further, judicial economy will be

748

served by defendants remaining in this action. These factors, recognized by the court in *Oxford First Corp., supra* as the proper elements of fairness under § 27, support the exercise of jurisdiction over Bagley and American.

The Court does not interpret defendants' motions as challenging personal jurisdiction with regard to the Trustee's claims.

### PENDENT JURISDICTION

Defendants have urged upon the Court several arguments in support of their contention that the Court may not exercise pendent jurisdiction over the claims of the shareholder plaintiffs grounded in state law. Several arguments are premised upon dismissal of each of the federal securities claims and are of no avail. Upon review of the remaining arguments of defendants, the pleadings and memoranda, the Court is of the view that defendants' arguments are not well-taken.

The Court clearly has the power to entertain the shareholder plaintiffs' state law claims if they and the federal counts "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The Court is satisfied that the amended complaint meets the *Gibbs* prerequisite. The shareholder plaintiffs' claims against each defendant stem from the latter's alleged misconduct in The Washington Mills—CSI merger, the scheme to artificially maintain the market price of the Company's shares and the *Shaffner* settlement.

The second, and more difficult question is whether the Court should exercise pendent jurisdiction. This decision is one entrusted to the sound discretion of the Court. Admittedly, the state law claims have assumed a dominant position in this action in light of the Court's views on the federal counts. The action is also most complex and there is thus some danger of jury confusion. Nonetheless, the Court feels that this action is one which is appropriate for the exercise of pendent jurisdiction.

The doctrine of pendent jurisdiction rests upon notions of judicial economy, convenience, and fairness to the litigants. Joinder of all of the shareholder plaintiffs' claims in one action will clearly serve judicial economy. The same may be said with regard to convenience of both the courts and the litigants, for the evidence which would be adduced with regard to the shareholder plaintiffs' federal claims is the same as that which would be necessary for the state claims. Resolving all the issues in one forum promotes consistency in judgment and, hence, fairness for litigants.

Defendants maintain that joinder of the state claims is likely to confuse the jury. The Court disagrees. First, it is clear that this is a risk that is present in all complex litigation. Second, the factual allegations of the shareholder plaintiffs' claims are the same. Thus, it does not appear that any more difficulty will be encountered by virtue of the state claims than in litigating the federal claims alone. The Court is confident as well that the risk of jury confusion will be minimized through the cooperation of all counsel.

The Court has considered the reasoning of *Kerby, supra*, and finds that decision persuasive, although not convincing. The Court does not view the availability of punitive damages under the state claims as a basis for declining pendent jurisdiction. If the plaintiffs are entitled to punitive damages, § 28(a) should not bar their access to this forum. Even if the state claims present an opportunity for abridging federal securities policy, the remedy lies with Congress, which could, presumably, preempt this field.

Nor is the Court convinced that unique questions of state law counsel against exercising pendent jurisdiction. The *Kerby* court noted that no decisions had been rendered by the state court under the applicable statute. In the instant case, however, the Court has the benefit of many state court pronouncements in the areas of fraud and corporate law. There is thus a parallel source upon which the Court may rely for

guidance. Further, federal courts are often charged with difficult interpretations of state law and to decline pendent jurisdiction on that basis would severely limit the availability of the federal forum. *Cf. Wohl v. Keene,* 476 F.2d 171 (4th Cir. 1973) (difficulty of state law questions is not ground for abstention.)

The Court, for the foregoing reasons, has concluded that it should exercise pendent jurisdiction over the state law claims.

## MOTION FOR A MORE DEFINITE STATEMENT

Several defendants have moved for an order directing the plaintiffs to file a more definite statement under Fed.R.Civ.P. 12(e). The Court notes at the outset that a 12(e) motion is appropriate only in very limited circumstances. The Rule, in pertinent part, provides:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, he may move for a more definite statement before interposing his responsive pleading.

In light of this narrow standard the Court must deny this motion.

 The amended complaint is not, in the Court's view, a model of clarity and specificity but, of course, it need not be. It is not surprising that an amended complaint alleging a scheme of securities fraud over a period of years, for example, is not as particular as a pleading in less complex cases. But that is not the standard under Rule 12(e). The test is whether it is reasonable to require defendants to respond to the amended complaint. The Court believes it is reasonable.

The defendants' experienced counsel will, without a doubt, utilize the provisions for discovery under the rules. Pretrial discovery is preferable to a more definite statement, *Zamora v. Massey-Ferguson, Inc.,* 336 F.Supp. 558 (D.C.Iowa 1972). Rule 12(e) was not intended as a substitute for discovery. *Oresman v. G. D. Searle & Co.* 321 F.Supp. 449 (D.R.I.1971); *Beishir v. Swenson,* 331 F.Supp. 1224 (D.Mo.1970).

The amended complaint is sufficient to require defendants to file their answer. The motion will therefore be denied and the defendants will be left to learn specific matters by way of discovery. *DeVore Brokerage Co. v. Goodyear Tire and Rubber Co.,* 308 F.Supp. 279 (D.Tenn.1969).

## INDISPENSABLE PARTIES

Defendants Wheat and Pullen argue that the plaintiffs have failed to join indispensable parties. This motion arises from plaintiffs' prayer to reopen the *Shaffner* litigation and the absence of several *Shaffner* defendants as defendants in this action.

The Court is of the opinion that this issue has been raised prematurely. Plaintiffs' brief in opposition suggests that they are not yet sure whether they will elect to seek the relief in question. More importantly, a determination will be necessary prior to trial as to whether such relief is barred by res judicata or collateral estoppel. Defendants' arguments under Fed.R.Civ.P. 19 will be addressed subsequent to that determination, if necessary.

## CONCLUSION

The Court is of the view that the purchaser-seller requirement stated in *Blue Chip, supra* requires dismissal of the "tender offer plaintiffs'" claims stated in Count I. That count remains as to the "purchaser plaintiffs'" claims against all defendants.

The Court has concluded that the *Shaffner* settlement agreement and judgment did not constitute a tender offer within the contemplation of the Williams Act. Count II must therefore be dismissed in its entirety.

The claims of the "tender offer plaintiffs" asserted in Count III have been found to be barred by the purchaser-seller requirement of 15 U.S.C. § 78o(c)(1). The Court is also of the opinion that Count III may be prosecuted only against defendants Thomas and Interstate. Thus, Count III will be

dismissed except as to the claims of the "purchaser plaintiffs" against Thomas and Interstate.

The motions to dismiss Count IV will be denied, and that count survives in its entirety.

The Court has rejected defendants' challenges to Count V which are premised upon alleged defects in the amended complaint. Defendants have also argued that a class action is an inappropriate procedure for resolving claims of common law fraud. The Court has concluded that this second argument is more properly raised in connection with the class certification issue and is thus raised prematurely.

Counts VI and VII have been considered together since they are based upon the *Shaffner* settlement and judgment. The Court is of the view that these counts do not state a cause of action for interference with contractual rights. The Court has concluded that Counts VI and VII have merely alleged a claim for fraudulent inducement which was the basis for Count V. Counts VI and VII must therefore be dismissed in their entirety.

Count IX will be dismissed as to defendants Riggsbee, Northwestern, American, Wheat, Interstate, Thomas and Pullen. Count IX survives otherwise.[36]

Count X must be dismissed as to defendants Johnston, Northwestern, American, Wheat, Interstate, Thomas and Pullen. Count X survives in all other respects.

Count XI will be dismissed as to all the movant defendants except Gilley.

Count XII survives the motions to dismiss in its entirety.

The motion to strike plaintiffs' prayer for punitive damages will be granted as to the federal counts, and will be denied as to the pendent state claims.

The Court is further of the view that an award of counsel fees would not be permitted in this action. The motion to strike this portion of the prayer for relief must therefore be granted.

The Court has determined that the motions to dismiss Counts IX, X, XI, and XII, as improvidently joined, or, in the alternative, to sever those counts, are better reserved for a ruling of the trial judge. The motions will be continued under advisement.

The Court has concluded that personal jurisdiction exists as to defendants Bagley and American by virtue of 15 U.S.C. § 78aa and the doctrine of pendent personal jurisdiction. The Rule 12(b)(2) motions will be denied.

Rule 12(e) affords a narrow basis for the Court to order plaintiffs to file a more definite statement of their claims. The Court is of the opinion that defendants have not met the requisite standard and the motion for a more definite statement will be denied.

The motion of defendants Pullen and Wheat to dismiss for failure to join indispensable parties will be relevant only if the plaintiffs elect to seek recission of the *Shaffner* settlement. These motions will be denied at this juncture with leave to renew same if it becomes appropriate at a later time.

Paragraphs 51–60 and 87 of the amended complaint are not, in the Court's view, "patently irrelevant and immaterial" as characterized by defendant Gilley. His motion to strike those paragraphs will therefore be denied.

Plaintiff has apparently abandoned all claims against defendant Wheat except those alleged in Counts VIII and XII. Wheat will therefore be dismissed as to Counts I through VII and IX through XI.

---

**36.** The Court recognizes that no allegations have been made with respect to defendant Chapple in either Counts IX, X or XI. While those counts do not seek relief from Chapple, the Court cannot grant dismissal (even were it necessary) absent an appropriate motion.